In the Matter of the Estate of JEANNIE D. BROWN, Deceased.

Surrogate's Court, Monroe County, July 18, 1939.

*Harris, Beach, Folger, Bacon & Keating* [*Kenneth B. Keating* of counsel], for the petitioner James E. Kittrell, and for Albert G. Odell and Security Trust Company of Rochester, as executors, etc., of Ella J. Barnard, deceased, legatees.

*Jacob Ark,* for the respondent Judson F. Browne.

*James E. Cuff,* for the respondents Natalia Browne Pierce and Homer V. Browne.

*T. P. McCarrick,* for Sarah P. B. Miller, legatee.

FEELY, S. In this contested probate of a will dated January 4, 1937, with a codicil dated May 11, 1937, the testimony reliably reports testatrix as having said about 1920 that years ago her family had been good to the Barnard children when they were growing up, and that because of this the members of the Barnard family, who in the course of the years had prospered, came together

at the suggestion of Henry Barnard about 1920 and agreed that upon Miss Brown ceasing to work further in a factory they would pay her a stated annuity for her life; and the agreement further provided that upon her death she would return to her benefactors whatever might then be left unused of their contributions to her support. The members of the Barnard family signed this agreement, and, according to the testimony of Alice E. Boorman, testatrix about 1920 said to this witness that the Barnards had agreed to give her so much a week if she signed an agreement the money would be returned to them when she was finished; and that she did not like to sign, but decided it was the best thing for her to do; and that she told this witness later she had signed it. This satisfactorily established that testatrix, although at first hesitant, finally did sign it. The agreement was apparently executed in counterparts, because the one now in evidence does not bear her signature. Even if we were to assume she never signed the agreement, still the evidence clearly shows she understood its substantial terms and orally accepted them and the fruits thereof, and that both she and the promisors consistently lived up to that understanding unto the end. The testimony of Mrs. Martha P. Tompkins reliably reports testatrix as saying in February, 1937, that " when I get through, what money there is I am going to give back to the people who gave it to me." To the same effect is the reliable evidence of the witnesses Nellie J. Lohges, Gertrude Matteson and Grace W. Barton. Testatrix was then about fifty-seven years of age and unquestionably competent to do business then. At that time testatrix had about $3,000 saved out of her earnings. For the ensuing eighteen years of her life she enjoyed the benefit of that Barnard contract, and managed to save out of such contributions the $10,000 now in her estate, which includes her own $3,000. The rest of that total can readily be traced and identified as having been saved out of the annual contributions she received from the Barnards.

There is not the slightest evidence that she was incompetent to do business at any time during the next thirteen years after she entered into the annuity agreement of July, 1920.

The first conduct claimed to indicate mental ailment was her act in 1933 peering, as if suspicious, through the screen doors at the summer cottage of her brother, the contestant; and her complaints, also reported by him, that she said the neighbors in her apartment had been spying on her and annoying her; and he also reported her forgetfulness and fear of poverty.

On March 29, 1933, five years before her death (October 3, 1938), she made a last will in which she recited the Barnard annuity con-

tract of 1920 and her desire to carry it out on her part by bequeathing her entire estate to the members of the Barnard family who had joined in that contract for her support and had lived up to it. Two days before that will she signed and verified a claim against the estate of Ella J. Barnard and therein specified it was for arrears due claimant under the contract of July, 1920.

In the two months preceding the will of January, 1937, now in question an adjustment was made between testatrix and the Madden estate of the latter's arrears under the contract, and by her letter of December 13, 1936, testatrix acknowledged receipt of a check of that estate. In December also she wrote Mr. Kittrell acknowledging his payments to her, which were on account of the contract. On the day after she made the will in question her attorney mailed her a letter with his bill for services in connection " with the annuity payments and the preparation of a new will for you." In reply she mailed him, in her letter of thanks, her check for his services. In her journal she entered her receipts from the various Barnard parties in separate accounts, one of which is headed in her writing: " 1937: Money & checks from Henry Barnard's Annuity. June 2nd, $364.00." Even if it be assumed, for the sake of argument, either that she had by then become absolutely unable to make any will in March, 1933, or in January or May, 1937, or if it be assumed she never signed that contract, still her estate, by virtue of her knowing acceptance of the benefits of the " contract " of 1920 equitably belonged to the Barnards, because it had been performed by them to her express satisfaction; and her estate would have been decreed to be their property and not that of her heirs. It is beyond doubt that a contract to make a last will, or a certain provision in one, is an obligation which the courts will decree should be specifically performed (*Morgan* v. *Sanborn*, 225 N. Y. 454, 462; *Rastetter* v. *Hoenninger*, 214 id. 66, 71); and they will impress a trust on the fund in such circumstances as those presented in this Brown case, even if the will now offered were denied probate.

The testimony tending to show Miss Brown was incompetent to make a last will in 1933 appears to me to be very weak and unsatisfactory, so that at the outset of this contest of a similar will made by her in January, 1937, the fact stands out that the plan set up in both those wills is just and natural in view of the premises, and to such an extent that both those wills, which are substantially the same in terms other than amounts of money, might not improperly be described as more the performance on her part of a contract of many years standing and of repeated recognition by her rather than a voluntary or gratuitous gift on her part of property to a non-relative. In view of the. contract of 1920 she could not have

made any other sort of will and have it carried out by the courts, even though they were to admit it to probate. (See cases cited *supra*.)

The conduct above described was pronounced irrational both by her nephew, who is a medical doctor, and also by the husband of her niece. Her only relatives are her brother and a nephew and a niece. These blood relatives had done comparatively little for her, at least in comparison with what her legatees had been doing since 1920. On the incidents described by Dr. Browne, the contestant, as to spying, annoyance, forgetfulness and fear of poverty, etc., together with other less pertinent facts, the superintendent of the local State hospital said the hypothetical picture read to him by the contestant's counsel indicated a case of senile psychosis of the paranoid type. Hardening of the arteries was naturally present. This appears to mean that the mind was so old that it was ill and not as strong as it had been, and that the patient thought she was being persecuted, but there is no proof that these beliefs on her part were without foundation in fact, and for that reason they cannot properly be called "delusions."

It is difficult for any one, especially one who did not see the person at the time, to determine either just when old age became a disease in that person, or to what degree. A person does not become incompetent in law — be the medical view what it may — solely by reason of old age, nor even by old age after it has become a disease. It is this end stage of age, disease, as I understand them, that the medical men designate as a "psychosis," the term "dementia" being limited in recent years to the natural lessening of mental power by age alone. Anyway, the disease must be shown to have become so acute as to have destroyed the patient's legal capacity at the time in question. From the medical point of view the legal viewpoint differs in that the law is concerned not so much with the mental sickness and weakness alone as it is with the question whether the patient, despite such illness or disease, is still able to know what he is about in the making of a last will.

Over against the hypothetical opinion of a capable psychiatrist, who did not see this lady until after she had been committed on July 12, 1937, to the local hospital in his charge as superintendent, to the effect that her psychosis probably had had its onset about eighteen months before her admission, the proponent called three medical witnesses who had seen her before her commitment. The first was G. H. Gage, M. D., who had treated her from January 16, 1936, on twelve occasions, the last visit being on March 8, 1937. He discovered an anemia, but never saw anything in her conduct, conversation or physical condition that led him to look for or take into account in diagnosis or treatment the possibility of mental disorder. The two other medical men were those who

treated her late in June, 1937, one on the twentieth and the other on the twenty-fifth. Dr. G. R. Levine, a specialist in nervous and mental diseases, said in his opinion she had been competent to make the will and the codicil at their respective dates. The other, Dr. L. T. Waldo, who for twenty-five years had been superintendent of State hospitals, said she had a senile psychosis that was not in an advanced stage when he saw her, and that she had suffered very little intellectual deterioration. On the basis of the hypothetical question put to him he testified that in his opinion she probably was competent at the respective date of the will and of the codicil. Both of these physicians said " remissions " were possible in senile psychosis, and all three said remissions were more frequent in arteriosclerosis, which in this case was given as the secondary cause. Contestant's psychiatrist preferred to call a " remission " rather an " improvement." He made the significant admission of the medical fact, to which the two other medical men had testified, that in such cases the patient has " his good days and his bad days," and that there are " remissions," or " improvements," in their symptoms or environment, indicating such states within the mind as are like those that are still sometimes called " lucid intervals," in which the patient might transact business. The testimony of Mrs. Carrie Hinds establishes that in May, 1937, testatrix told her she had made a codicil.

The proponent's other lay evidence markedly preponderates in showing a great number of such good days, consistent transaction of financial matters unassisted, and intelligent co-operation with others in church work, and in social contacts. In particular, her handwriting, as it appears in her letters, in her account book, in her many checks and check stubs entries thereof, carrying accurately her state of account with the bank, from time to time, also in her deposit slips, and in her double indorsements of seven checks whereby she corrected the misspelling of her name as payee — six of them being in Exhibit 43, one about March 1, 1937 (and see Exhibit 38), and one as late as June 1, 1937 (No. 139454 in Exhibit 43).

All these specimens of her handwriting, and especially that appearing in her subscription to both wills and to the codicil, including with the latter her own memorandum as to the contents of the codicil, and her list of the addresses of her own relatives and her computation of the arrears, indicate to me impressively — although the attempt was made to show it was all purely automatic and a matter of habit quite consistent with mental derangement — the fact that she had possessed throughout the years a steady nervous control of her muscles, and through them wrote well-formed, intelligent words and correct entries in a free, natural

and calm movement, down even beyond the date of the codicil, May 11, 1937, and on into the middle of June, 1937. It is only in the middle of June, a month before she went to the Rochester State Hospital, that a few signatures are found that show any nervous disturbance, and even these few shaky ones are followed at once by signatures quite as normal as any she had made before.

My experience has been that there is hardly any approach to the state of mind or emotion of a decedent that is as immediate and as satisfactory as is a goodly quantity of the person's handwriting, especially in correspondence of intelligent content, and also in books of account and check stubs showing accurate arithmetic and intelligent co-operation with business custom.

On the whole, the evidence in favor of this testatrix having been able to make a will in 1933, and to modify it only in amounts on January 4, 1937, and to make a very minor change in the latter by the codicil of May 11, 1937, makes it far more probable to my mind than not that she was quite competent, from the legal point of view, to make any of those three testamentary papers at their several dates.

My conclusion is that the contestant's objections to the latter two should be dismissed on the merits and that said writings be admitted and probated as valid testamentary acts.

Enter a decree in accord with this decision.